IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRANDY MARIE BECK, | ) | CASE NO.  4:19-CV-02320-SL |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SARA LIOI |
| vs. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | MAGISTRATE JUDGE |
| SECURITY, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Brandy Marie Beck ("Plaintiff" or "Beck"), challenges the final decision of Defendant Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), finding her not disabled and therefore not entitled to Supplemental Security Income ("SSI") under Title XVI of the Social Security Act,42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.   PROCEDURAL HISTORY

In September 2013, Beck filed an application for SSI.  (Transcript ("Tr.") 86.)  Beck alleged an amended disability onset date of January 1, 2015 and claimed she was disabled due to digestive problems, back problems, clinical depression, anxiety disorder, ankle, bipolar, severe migraines, severe fibromyalgia, hip problems, shoulder problems, degenerative disc disease, panic attacks, and scoliosis.  (*Id.* at 82, 117.)

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

On July 13, 2015, after a hearing, an Administrative Law Judge ("ALJ") found Beck disabled as of January 1, 2015.  (*Id.* at 82-86, 1387.)

On March 13, 2017, the Social Security Agency found medical improvement had occurred and Beck was no longer disabled as of March 1, 2017.  (*Id.* at 144-46, 1387.)  The Agency upheld that determination on reconsideration following a hearing before a Disability Hearing Officer.  (*Id.* at 1387.)  Beck then filed a written request for a hearing before an ALJ.  (*Id.*)

On July 12, 2018, an ALJ held a hearing, during which Beck, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On November 2, 2018, the ALJ issued a written decision finding Beck's disability ended on March 1, 2017, and that Beck had not become disabled again since that date.  (*Id.* at 1387-94.)  The ALJ's decision became final on August 11, 2019, when the Appeals Council declined further review.  (*Id.* at 1-7.)

On October 4, 2019, Beck filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14, 17.)  Beck asserts the following assignment of error:

> (1) The [ALJ] found Plaintiff had shown medical improvement, was no longer disabled, and retained a residual functional capacity for a range of light, unskilled work.  This finding lacked the support of substantial evidence.

 (Doc. No. 14 at 1.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Beck was born in December 1978 and was 39 years-old at the time of her administrative hearing (Tr. 1387, 1393), making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. § 416.963(c).  She has at least a high school education and is able to communicate in English.  (Tr. 1393.)  She has no past relevant work.  (*Id.*)

2

**B.** **Medical Evidence[2]**

On May 26, 2016, Beck saw her primary care physician, R. Mark Shivers, M.D., for complaints of diffuse pain and fatigue, as well as thoracic pain. (*Id.* at 375.) On examination, Dr. Shivers found Beck had reproducible thoracic pain. (*Id.*) Beck's diagnoses consisted of thoracic pain, Vitamin D deficiency, fibromyalgia, and a history of anxiety and chronic lumbar pain. (*Id.* at 376.) Dr. Shivers ordered imaging and medications. (*Id.*)

On August 2, 2016, Beck saw Dr. Shivers for a follow-up appointment. (*Id.* at 377.) Beck complained of abdominal pain and bloating for the past two days, as well as "some urgency and dysuria." (*Id.*)

On September 30, 2016, Beck saw David Gutlove, M.D., at Mercy Pain Medicine for an initial consult regarding her history of "persistent neck and back pain." (*Id.* at 318.) Beck reported the pain was in her whole back and radiated to her neck and hips. (*Id.*) She rated her pain at a 7/10 in intensity and described it as aching in nature. (*Id.*) She also complained of numbness and tingling in her arms. (*Id.*) Bending, lifting, and activity exacerbated the pain, while rest, heat, and hot showers alleviated it. (*Id.*) Beck told Dr. Gutlove the pain interfered with her activities of daily living ("ADLs") and sometimes affected her sleep. (*Id.*)

On examination, Dr. Gutlove found Beck had a "slow," "deliberate" gait without "any specific antalgic component." (*Id.* at 320.) Beck had pain with lumbar extension and flexion and a reduced range of motion in the cervical and thoracic regions of the spine. (*Id.*) Dr. Gutlove also found tenderness to palpation along the lumbar and thoracic paraspinous muscles. (*Id.*) Beck exhibited 5/5 strength in all extremities. (*Id.*)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

Dr. Gutlove diagnosed fibromyalgia, low back pain, chronic pain syndrome, history of anxiety, migraine headaches, bipolar disorder, insomnia, and probable cervicogenic headaches. (*Id.* at 321.) He prescribed Zanaflex and increased Beck's dosage of Neurontin. (*Id.*) He recommended physical therapy, cervical lumbar x-rays, and a TENS unit. ( *Id.*)

On October 25, 2016, Beck went to the Gastroenterology Center of Salem complaining of "a lot of pain in her stomach, whatever she does." (*Id.* at 329.) Beck reported nothing helped the pain and it was getting worse. (*Id.*) Beck described the pain as severe and sharp. (*Id.*) Lorraine Cresanto, CRNP, diagnosed Beck with irritable bowel syndrome with spastic colon. (*Id.* at 331.) CRNP Cresanto prescribed hyoscyamine sulfate and ordered an abdominal CT scan. (*Id.*) Beck requested tramadol, but CRNP Cresanto told Beck she did not prescribe any pain medications. (*Id.*)

On December 14, 2016, Beck saw Dr. Shivers complaining of intermittent headaches on the right side of her head and cervical neck pain that she reported having for approximately two years. (*Id.* at 385.) Beck reported the headaches had increased in both intensity and frequency. (*Id.*) Beck reported problems with range of motion of the cervical spine. (*Id.*) Regarding her headaches, Beck told Dr. Shivers she gets nausea and emesis with her headaches but denied any vision changes. (*Id.*) On examination, Dr. Shivers found Beck walked with a normal gait but had painful range of motion of the cervical spine. (*Id.* at 386.) Dr. Shivers diagnosed Beck with cervicalgia and headache and ordered a CT scan. (*Id.*)

On January 5, 2017, Beck saw Dr. Shivers for depression. (*Id.* at 387.) Beck reported crying jags and lack of energy. (*Id.*) Dr. Shivers noted Beck had previously been under psychiatric care and taking Seroquel and Xanax. (*Id.*) Dr. Shivers diagnosed Beck with major depressive disorder, recurrent, and prescribed venlafaxine. (*Id.* at 388.)

A January 12, 2017 CT of Beck's abdomen and pelvis revealed some mild diverticulosis. (*Id.* at 361.)

In January 2017, Beck went to the Salem Community Hospital emergency department complaining

4

of abdominal pain.  (*Id.* at 347.)  Treatment providers diagnosed Beck with cholelithiasis without obstruction. (*Id.*)

A January 21, 2017 ultrasound revealed a 10 mm gallstone near the beck of the gallbladder.  (*Id.* at 359.)

On February 2, 2017, Beck saw Dr. Shivers for follow-up of her ultrasound.  (*Id.* at 389.)  Dr. Shivers noted the ultrasound had shown a gallstone and that Beck was scheduled to see a surgeon the next week.  (*Id.*)  Beck also reported she was starting physical therapy the next day for her "chronic cervical pain."  (*Id.*)

On February 3, 2017, Joshua White, PT, evaluated Beck as part of an initial physical therapy evaluation.  (*Id.* at 557.)  Beck reported that when she has a bad day, she is in bed all day.  (*Id.*)  She rated her current pain at a 1/10, with a severity at best of 0/10 and a severity at worst of 9/10.  (*Id.*)  Beck explained that about a year ago, she started having pain in the right cervical spine up into the right side of her head.  (*Id.*)  Sometimes she gets "blinding headaches where she see's [sic] light flashing, is nauseous and gets cold chills."  (*Id.*)   On examination, PT White found Beck showed "min – mod facet restriction C1 – C3 bilat with C6 – T2 showing mod limitation too.  Pt shows mod decrease in bilat first rib depression mobility too."  (*Id.*)  White also found Beck showed "mod high tone and palpatory pains R>L in the Levator, UT, and suboccipitals bilat."  (*Id.*)   Beck also exhibited moderate forward head and rounded shoulders in posture.  (*Id.*)  White found Beck's rehabilitation potential to be fair and estimated Beck would require two months of treatment.  (*Id.* at 558.)

On February 6, 2017, Beck saw Marissa Ragon, CNP, for medication management.  (*Id.* at 396.)  CNP Ragon found Beck to be "[m]oving very slowly" and noted she had fibromyalgia.  (*Id.*)  Beck reported she was anxious about the "abnormality in her brain."  (*Id.*)  Beck also reported being depressed, anxious, and having mood swings.  (*Id.*)  Beck told Ragon these symptoms began two years ago.  (*Id.*)

5

Beck reported feeling down, lacking motivation, and crying often.  (*Id.*)  Beck told Ragon she could not clean her home or care for or help with her grandchildren.  (*Id.*)  Beck stated she "feels very anxious around people so she avoids them."  (*Id.*)   Beck also experienced unpredictable panic attacks where she became irritable, her heart would race, she would start to sweat and feel numb, and where she could not breathe normally.  (*Id.*)  Beck also reported not eating well.  (*Id.*)  Ragon noted Beck cried during the session.  (*Id.*)

 On examination, Ragon found Beck anxious and depressed with a constricted affect.  (*Id.* at 397.) Beck had racing and circumstantial thoughts and slowed speech but had an organized and rational thought process and normal speech.  (*Id.*)  Ragon noted Beck walked with a slumped over gait.  (*Id.*)  Ragon found Beck's insight and judgment to be good.  (*Id.* at 398.)  Ragon diagnosed Beck with Bipolar I disorder, mild, MRE depressed.  (*Id.*)  Ragon prescribed Effexor, Seroquel, and Xanax.  (*Id.*)

On February 8, 2017, Beck saw surgeon Jonathan Pulido, M.D., for pain every time she ate.  (*Id.* at 411.)  Dr. Pulido recommended Beck undergo a laparoscopic cholecystectomy.  (*Id.* at 414.)  Dr. Pulido performed the operation on February 21, 2017.  (*Id.* at 415.)

On March 16, 2017, Beck saw Dr. Shivers for left chest pain and abdominal pain.  (*Id.* at 421.) Beck reported intermittent left-sided chest pain with noted swelling that had begun a month before.  (*Id.*) Beck also reported having abdominal pain after eating the day before.  (*Id.*)  Beck told Dr. Shivers the abdominal pain had occurred on only one occasion.  (*Id.*)  On examination, Dr. Shivers found Beck had "minimal tenderness to palpation" in the mid-abdominal region.  (*Id.* at 422.)  Dr. Shivers ordered imaging and blood work concerning Beck's chest pain and referred her to her surgeon regarding her abdominal pain.  (*Id.*)

A March 22, 2017 MRI of the brain showed enlargement of the pituitary gland that "abut[ted] the optic chiasm."  (*Id.* at 429.)

On March 23, 2017, Beck saw Dr. Shivers for follow-up regarding her recent chest x-ray.  (*Id.* at 427.)  Dr. Shivers noted the "[r]esults showed hyperinflated lungs consistent with COPD/emphysema."  (*Id.*)  Beck admitted former tobacco use.  (*Id.*)  Dr. Shivers also noted an elevated calcium level.  (*Id.*)  Dr. Shivers diagnosed COPD and ordered a pulmonary function test, which was normal.  (*Id.* at 428, 444.)

On March 28, 2017, Beck saw Dr. Shivers for follow-up regarding the recent MRI of her brain.  (*Id.* at 433.)  Dr. Shivers noted "[s]uspect pituitary enlargement."  (*Id.*)  Beck denied any loss of peripheral vision.  (*Id.*)  Dr. Shivers diagnosed neoplasm of the pituitary gland.  (*Id.* at 434.)

On March 29, 2017, Beck saw Dr. Gutlove for pain management, primarily for her neck pain.  (*Id.* at 458.)  Dr. Gutlove explained he would not prescribe Tramadol because Beck's imaging was normal.  (*Id.*)  Beck cried and told Dr. Gutlove she deserved pain relief.  (*Id.*)  Dr. Gutlove explained the treatments he prescribed were to help with pain relief.  (*Id.*) Dr. Gutlove offered Beck a trigger point injection, which she refused.  (*Id.*)  Beck rated her pain as 9/10 and described it as shooting, stabbing pain that radiated to her right shoulder.  (*Id.*)  Beck also complained of numbness and tingling in her right arm.  (*Id.*)  Beck also reported being unable to touch her scalp "due to the pain from the tumor she has in her head."  (*Id.*)  Beck told Dr. Gutlove the pain was worse with taking too deep a breath and lifting, but was better with a heating pad, hot showers, and her Neurontin.  (*Id.*)

On examination, Dr. Gutlove found Beck had a limited cervical range of motion due to pain.  (*Id.* at 460.)  While Beck moved her entire body for lateral motion, she refused to perform the extension motion.  (*Id.*)  Beck had pain "with minimal touching of cervical and upper back."  (*Id.*)  Dr. Gutlove found positive cervical facet tenderness bilaterally and positive Spurling sign bilaterally, but negative Hoffman sign bilaterally.  (*Id.*)  Beck exhibited 5/5 strength in her upper extremities.  (*Id.* at 460-61.)  Dr. Gutlove diagnosed chronic pain syndrome with fibromyalgia, low back pain, history of anxiety disorder, migraine headaches, bipolar disorder, insomnia, and probable cervicogenic headaches.  (*Id.* at 461.)  He

prescribed a compounding cream, Neurontin, Robaxin, and TENS supplies.  (*Id.*)  He also encouraged physical therapy.  ( *Id.*)

On April 11, 2017, Beck saw Dr. Shivers to review her recent MRI results.  (*Id.* at 615.)  Dr. Shivers noted the MRI revealed enlargement of the pituitary gland and that it seemed "to impress upon the optic chiasm." (*Id.*)  Beck denied any visual changes.  (*Id.*)  Dr. Shivers diagnosed neoplasm of uncertain behavior and advised Beck to contact her insurance company regarding appropriate referrals that would accept her insurance plan.  (*Id.* at 616.)

On April 13, 2017, Beck saw CNP Ragon for medication management.  (*Id.* at 475.)  Beck reported feeling stressed, aggravated, and overwhelmed.  (*Id.*)  While her medications were helping her cope better, Beck told Ragon she was "still struggling." (*Id.*)  Beck complained of having "many medical appointments" and felt "like she spends more time in her van than she does at home." (*Id.*)  Beck told Ragon she felt her brain tumor was "causing her vision to decline" and felt it was unfair that her treatment providers refused to prescribe pain medication to her because of her legal history.  (*Id.*)  Beck described her pain as "debilitating" and stated she was going to go to a local emergency room in the hope she would be prescribed pain medication as she felt she had no other option.  (*Id.*)  Beck said it was against her religion to wish for death or commit suicide.  ( *Id.*)

On examination, Ragon found Beck anxious and depressed, with a constricted affect, and noted she was very anxious and cried during the session.  (*Id.*)  Beck had racing thoughts but an organized and rational thought process.  (*Id.*)  Beck exhibited fast, loud speech and a slumped, slow gait.  (*Id.*)  Beck's insight and judgment were good, and she had made some progress.  (*Id.* at 477.)  Ragon prescribed Seroquel and Xanax but discontinued Effexor.  (*Id.* at 476.)

On April 20, 2017, Beck saw Dr. Shivers for pain in her left hand and left hip.  (*Id.* at 446.)  Beck told Dr. Shivers the pain had been present for weeks and it had not lessened in intensity since it began.

(*Id.*)  On examination, Dr. Shivers found Beck walked with a normal gait.  (*Id.* at 447.)  Beck had "reproducible pain to the dorsal lateral aspect of the left hand" and a "positive Faber sign" of the left hip. (*Id.*)  Dr. Shivers ordered x-rays, which were unremarkable.  (*Id.* at 447, 454, 457.)

On April 26, 2017, Beck saw Dr. Shivers for complaints of chest pain that had been "present for a significant period of time."  (*Id.* at 450.)  On examination, Dr. Shivers found reproducible pain the left axillary region.  (*Id.* at 451.)  Dr. Shivers noted Beck walked with a normal gait.  (*Id.*)  Dr. Shivers diagnosed Beck with chest pain, unspecified, and ordered a mammography x-ray.  (*Id.*)

On May 1, 2017, PT White reevaluated Beck for physical therapy for her headaches and neck pain. (*Id.* at 566.)  Beck told White she had not been coming in because of the severe pain in her cervical spine and migraine headaches.  (*Id.*)  She also reported being unable to perform any of the home exercises because of pain.  (*Id.*)  Beck described feeling heavy pressure in her head and back, as well as more frequent tingling in her arms and hands.  (*Id.*)  She rated her current pain in her back and shoulder at an 8/10 and told White it was a 10/10 at worst.  (*Id.*)  On examination, PT White found Beck showed "min – mod facet restriction C1 – C3 bilat with C6 – T2 showing mod limitation too.  Pt shows mod decrease in bilat first rib depression mobility too."  (*Id.*)  White also found Beck showed "mod high tone and palpatory pains R>L in the Levator, UT, and suboccipitals bilat."  (*Id.*)  Beck also exhibited moderate forward head and rounded shoulders in posture.  (*Id.*)  White noted, "Pt. has not improved much since her initial evaluation wholly due to attendance and she was sent back to her physician due to this who gave her a new script to continue."  (*Id.* at 567.)  White recommended Beck undergo physical therapy once a week for two months.  (*Id.* at 568.)

On June 15, 2017, Beck saw Dr. Shivers for follow-up regarding her chronic medical issues.  (*Id.* at 629.)  Beck complained of cervical neck pain and intrascapular pain.  (*Id.*)  Beck denied any blurred or double vision, as well as any vision changes.  (*Id.*)  On examination, Dr. Shivers found Beck walked with

a normal gait and her musculoskeletal condition was unchanged.  (*Id.*)  Dr. Shivers diagnosed cervicalgia, major depressive disorder, and Vitamin D deficiency.  (*Id.* at 630.)

On October 10, 2017, Beck saw Dr. Shivers for a follow-up examination.  (*Id.* at 640.)  Beck complained of diffuse joint pain, including her hands, wrists, and knees.  (*Id.*)  On examination, Dr. Shivers found Beck walked with a normal gait but had "acute swelling" of her hands bilaterally.  (*Id.* at 641.)  Dr. Shivers diagnosed Beck with major depressive disorder, Vitamin D deficiency, and arthropathy. (*Id.*)

On November 16, 2017, Beck again saw Dr. Shivers for a follow-up examination.  (*Id.* at 643.) Beck reported continuing cervical neck pain that radiated into both arms, as well as headaches.  (*Id.*)  On examination, Dr. Shivers found reproducible pain in the cervical spine, as well as painful range of motion of the cervical spine.  (*Id.*)  Dr. Shivers ordered an MRI of the cervical spine.  (*Id.*)

On November 20, 2017, Beck saw CNP Ragon for medication management.  (*Id.* at 695.)  Beck reported being "severely depressed" lately, although she did not want an antidepressant.  (*Id.*)  Beck told Ragon she planned to ask her medical provider for Tramadol because her pain was worse.  (*Id.*)  Beck reported she was anxious, but Xanax helped, and she slept well with Seroquel.  (*Id.*) On examination, Ragon found Beck oriented in all spheres.  (*Id.*)  Beck showed good eye contact and exhibited normal speech quantity, rate, and amplitude.  (*Id.*)  Beck was cooperative and talkative, although she was also restless.  (*Id.*)  Beck demonstrated logical thought processes and associations, and her stream of thought was unremarkable.  (*Id.*)  Ragon found Beck had a depressed mood and blunted affect, but her insight and judgment were good, and her memory and concentration were fair.  (*Id.*)  Ragon noted Beck had a steady gait.  (*Id.*)  Beck's medications and diagnoses remained unchanged.  (*Id.* at 696.)

A November 24, 2017 MRI showed Beck's pituitary gland had enlarged since the imaging taken on April 10, 2017.  (*Id.* at 646.)  An MRI of Beck's cervical spine was unremarkable.  (*Id.* at 648.)

On January 4, 2018, Beck saw Hyo Kim, M.D., for pain in her neck radiating down to her scapular areas, as well as pain in her hips, knees, and hands.  (*Id.* at 707.)  Beck told Dr. Kim her average pain level was an 8/10.  (*Id.*)  On examination, Dr. Kim found lumbar and cervical spinal tenderness, paraspinal tenderness, involuntary spasms, multiple trigger points, and limited range of motion.  (*Id.*)  Dr. Kim's assessments included chronic pain, physical impairment because of pain, and an inability to work from persistent pain.  (*Id.*)  Dr. Kim diagnosed Beck with fibromyalgia and osteoarthritis of the hands, hips, and knees.  (*Id.* at 707-08.)  Dr. Kim prescribed a "[s]mall dose of opioid pain meds to help the pain" until further tests and records were obtained.  (*Id.* at 708.)

On February 1, 2018, Beck saw Dr. Kim for a follow-up appointment.  (*Id.* at 709.)  Dr. Kim's examination findings, diagnoses, and prescription were the same.  (*Id.* at 709-10.)

On February 12, 2018, Beck went to Community Medical Associates to establish care regarding her fibromyalgia, arthritis, hand issue, and enlarged tumor on the right side of her head.  (*Id.* at 701.)  Beck complained of severe headaches, as well as severe pain in all joints of her body.  (*Id.*)  Beck's examination was normal, and her diagnoses consisted of pituitary mass, arthralgia, and anxiety.  (*Id.* at 702.)

On March 13, 2018, Beck returned to Community Medical Associates for follow-up of her labs and her tumor.  (*Id.* at 700.)  At this visit, Beck complained of some urinary frequency.  (*Id.*)  Beck's examination was normal.  (*Id.* at 701.)

On March 27, 2018, Beck saw Dr. Kim for a follow-up appointment.  (*Id.* at 711.)  Dr. Kim's examination findings and diagnoses were the same.  (*Id.* at 711-12.)  Dr. Kim continued Beck's Norco prescription.  (*Id.* at 712.)

On April 6, 2018, Beck saw CNP Ragon for medication management.  (*Id.* at 725.)  Beck told Ragon she was irritable and should have stayed home because she had "a feeling that today is going to be

11

a big Bipolar Day!" (*Id.*)  Beck reported feeling exhausted. (*Id.*)  Beck told Ragon she was stressed because of her upcoming disability hearing and she was concerned about her daughter being bullied. (*Id.*) On examination, Ragon found Beck oriented in all spheres, with good eye contact and normal speech. (*Id.*)  Beck was talkative but restless. (*Id.*)  Ragon found Beck's thought processes and associations logical, her stream of thought unremarkable, her mood and affect irritable, and her fund of knowledge, memory, insight, and judgment good. (*Id.*)  Ragon noted Beck walked with a steady gait. (*Id.*)

On April 13, 2018, Beck returned to Community Medical Associates for follow-up of her pituitary tumor and a check-up. (*Id.* at 699.)  Beck was supposed to see rheumatology, but she missed her appointment because she was sick. (*Id.*)  The treatment records reflect normal examination findings and diagnoses of pituitary mass, arthralgia, and anxiety. (*Id.* at 699-700.)

On May 1, 2018, Beck saw Dr. Kim for a follow-up appointment. (*Id.* at 713.)  Dr. Kim again continued Beck's Norco prescription. (*Id.* at 714.)

On May 23, 2018, Beck saw Varun R. Kshettry, M.D., at the Cleveland Clinic Department of Neurological Surgery for evaluation of her headaches and pituitary tumor. (*Id.* at 739.)  Beck complained of "constant moderate pain" and "extreme sensitivity to light touch" in certain areas. (*Id.* at 740.)  Beck also reported "seeing constant flashes of light in central fields bilaterally" and "occasional blurry vision," but denied diplopia and other visual changes and deficits. (*Id.*)  On examination, Dr. Kshettry found Beck could stand and walk with a normal gait, including tandem gait. (*Id.* at 742.)  Dr. Kshettry asked Beck to undergo "formal vision testing with Humphrey visual fields" and have the results sent to him for review. (*Id.* at 739.)  If the vision testing "suggest[ed] any vision loss attributable to the lesion," Dr. Kshettry would recommend surgery. (*Id.*)  Even if the vision testing was normal, given the growth, compression of the optic chiasm, and Beck's young age, Dr. Kshettry would recommend treatment as opposed to continued observation. (*Id.*)  Dr. Kshettry favored surgery. (*Id.*)  An addendum to Dr. Kshettry's

12

treatment notes reflect Beck's formal visual field testing showed normal vision.  (*Id.* at 742.)

On May 30, 2018, Beck saw Dr. Kim for a follow-up appointment, and Dr. Kim again continued Norco.  (*Id.* at 715-16.)

On June 1, 2018, Beck saw CNP Ragon for medication management and reported feeling "'good.'"  (*Id.* at 722.)  On examination, Ragon found Beck oriented in all spheres, with good eye contact and normal speech.  (*Id.*)  Beck was talkative but restless.  (*Id.*)  Ragon found Beck's thought processes and associations logical, her stream of thought unremarkable, her mood euthymic, her affect congruent, and her fund of knowledge, memory, insight, and judgment good.  (*Id.* at 722-23.)  Ragon noted Beck was calm and cooperative and walked with a steady gait.  (*Id.*)

On June 5, 2018, Beck returned to Community Medical Associates for medication refills.  (*Id.* at 731.)  The treatment notes reflect Beck missed her rheumatology appointment multiple times and that she does well on Neurontin.  (*Id.*)  Beck reported some swelling in her left arm and some tenderness to her left axilla.  (*Id.*)  Beck was to undergo an ultrasound of a superficial mass.  (*Id.* at 732.)

## C.    State Agency Reports

### 1.    Physical Impairments

On March 10, 2017, state agency reviewing physician Leon Hughes, M.D., opined Beck could occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds.  (*Id.* at 102-03).  Beck could stand or walk about six hours in an eight-hour workday and sit for a total of six hours in an eight-hour workday. (*Id*. at 102.)  Her ability to push and pull was unlimited, other than the restrictions for lifting and carrying.  (*Id.*)  Beck could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl.  (*Id.* at 103.)  While Beck was unlimited in her ability to balance, she could never climb ladders, ropes, or scaffolds.  (*Id*.)

On March 13, 2017, state agency reviewing physician Steve McKee, M.D., opined identical limitations.  (*Id.* at 104-05.)

On May 31, 2017, state agency reviewing physician Anne Prosperi, D.O., affirmed these opinions regarding Beck's ability to lift, carry, sit, and stand on reconsideration.  (*Id.* at 576-77, 583.)  Dr. Prosperi opined Beck could frequently climb ramps and stairs, as well as crouch.  (*Id.* at 578.)  Beck could occasionally stoop and crawl, but could never climb ladders, ropes, or scaffolds.  (*Id.*)  Dr. Prosperi also found Beck's ability to balance unlimited.  (*Id.*)  Dr. Prosperi opined Beck had no manipulative, vision, communicative, or environmental limitations.  (*Id.* at 579-80.)

2.      **Mental Impairments**

On February 16, 2017, state agency reviewing psychologist Janet Souder, Psy.D., opined Beck was moderately limited in her abilities to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting.  (*Id.* at 106-07.)  Dr. Souder limited Beck to limited to one to two and occasional three to four step tasks, low production work in a relaxed setting with minimal routine changes, and superficial interaction with coworkers, supervisors, and the general public.  (*Id.*)

On June 19, 2017, state agency reviewing psychologist Todd Finnerty, Psy.D., affirmed these opinions on reconsideration.  (*Id.* at 584-86.)

**D.  Hearing Testimony**

During the July 12, 2018 hearing, Beck testified to the following:

14

- She drives, but her back will start hurting "like crazy" and her toes start cramping up. (*Id.* at 20.)  She tries to stay as close to home as possible if she goes out.  (*Id.*)  Close to home for her is half an hour, which gets her to the grocery store and one of her doctors.  (*Id.*)  Many of her doctors' offices are further than that.  (*Id.*)  To get to the appointments that are further than 30 minutes away, she makes sure she takes the medication she is supposed to take in the morning, which helps a lot, and she gives herself enough time to get there where if she needs to pull over and stretch her leg, she can.  (*Id.* at 21.)

- Her doctor has not yet scheduled surgery for her pituitary tumor.  (*Id.* at 22.)  She was to undergo an HCHT stimulation test the following Monday.  (*Id.*)  This test was for the "optical part, because since it's grown, he wants to make sure that it hasn't started to affect it yet because when we talked, my eyesight – stuff was starting to get blurry, going out of focus."  (*Id.*)  She "constantly" has "white dots like everywhere."  (*Id.*)  The blurry vision "comes and goes."  (*Id.* at 26.)  The white dots and blurry vision had been present about a month.  (*Id.* at 22, 25.)  The white dots did not really affect her ability to see or differentiate things.  (*Id.* at 22.)  It was more just annoying.  (*Id.*)  She has been having more pressure in her eyes and losing focus more to where, if she is looking at something, she has to get closer to it.  (*Id.* at 23.)  Her last optometrist appointment was in August 2017, and she had another appointment scheduled for August 2018.  (*Id.*)  She was not wearing glasses at the hearing.  (*Id.*)  She cannot wear glasses because she cannot put anything on her heard without pain.  (*Id.* at 23-24.)  Her optometrist had prescribed glasses two years ago, but she stopped wearing them a year ago.  (*Id.* at 24.)

- She also gets pressure around her forehead above her eyebrow.  (*Id.* at 22.)  Sometimes she has to hold her head and sit there for a minute because the pressure gets so bad.  (*Id.* at 22-23.)

- She has pain from the front of the right side of her head all the way down into her neck.  (*Id.* at 26.)  The pain is constant.  (*Id.*)  A couple of weeks ago, she started having pain on her left side as well.  (*Id.*)

- When she missed appointments because she was sick, it was because she had one of her headaches.  (*Id.* at 29.)  When she wakes up with a headache, she is "down all day."  (*Id.*)

- She has not had any manic episodes like she used to have.  (*Id.* at 30.)  She still has bouts of anger.  (*Id.* at 41.)  She will either "go off in anger or [she'll] go off and cry."  (*Id.* at 42.)  This can happen three times in a week.  (*Id.*)

- She takes Norco for her arthritis and fibromyalgia.  (*Id.* at 32.)

- She lives in a trailer with her fourteen-year-old daughter.  (*Id.* at 18, 35.)  On a typical day, she gets up, has coffee, and reads her Bible.  (*Id.* at 34.)  Then she will try to do a little bit around the house.  (*Id.*)  Her daughter does most of the housework.  (*Id.*)  She cannot do much bending or standing up for long.  (*Id.*)  If she is "lucky," she is up for

20 minutes at a time and then she sits for 30 minutes.  (*Id.*)  Then she gets back up,
stretches her legs, is up for another 20 minutes, and then back down.  (*Id.*)  That is her
routine every day.  (*Id.*)  She wipes down her counters and puts some dishes in the
dishwasher.  (*Id.*)  She cooks, although not as much as she used to.  (*Id.*)  She also
does not bake as much as she used to because she cannot stand up that long anymore.
(*Id.*)  She does some laundry with her daughter's help.  (*Id.* at 35.)  She loads the
clothes and puts the soap in, but her daughter takes the clothes out, moves them to the
dryer, and then takes them out of the dryer when they are dry.  (*Id.*)  She sits in her
chair and helps her daughter fold the clothes, but her daughter carries the laundry
basket.  (*Id.*)  She straightens up the bathroom, but her daughter scrubs and sweeps it.
(*Id.*)  Her son-in-law mows the yard for her.  (*Id.* at 36.)  She grocery shops with her
daughter.  (*Id.*)  Her daughter helps take the groceries to the car, put them in the car,
bring the groceries into the house from the car, and put the groceries away.  (*Id.*)  Her
daughter also accompanies her to her doctors' appointments.  (*Id.*)

- She tries to go to church as often as she can.  (*Id.* at 37.)  Her church has services
  twice on Sundays and on Thursdays, but sometimes she will not make it to all of
  them.  (*Id.*)  If she has to pick one, she tries to at least go on Sunday night.  (*Id.*)  If
  she can, she tries to go on Sunday morning as well as Thursday night for Bible study.
  (*Id.*)  Her church is about 30 minutes from her house.  (*Id.*)  Services are an hour and a
  half, and they let her stand and walk if she needs to.  (*Id.* at 38.)  There are maybe 30
  people in attendance for a service.  (*Id.*)

- She reads as a hobby.  (*Id.* at 39.)  She spends an hour or two a day reading if she can
  focus on it for that long.  (*Id.*)  Sometimes if she focuses for too long on a book, or
  even her phone, she will get pain in her eye and then into her head.  (*Id.*)

The ALJ told the VE Beck had no past work.  (*Id.* at 44.)  The ALJ then posed the following

hypothetical question:

> The first hypothetical . . . is assume a hypothetical individual of the
> claimant's age and education.  Further assume this individual is limited to
> light work with the following additional limitations.  No ladders, ropes, or
> scaffolds, all of the other postural would be occasional.  Also, the
> individual would be limited - - occasional exposure to unprotected
> heights, moving mechanical parts, and operating a motor vehicle.
>
> I'll say avoid concentrated exposure to dust, odors, fumes, and pulmonary
> irritants.  The individual would be limited to simple routine tasks, but not
> at a production rate pace; simple work-related decisions; superficial
> interaction with supervisors, coworkers, and the public; few changes in a
> routine work setting.  Would there be any work for such a hypothetical
> individual?

(*Id.*)

16

The VE testified the hypothetical individual would be able to perform other representative jobs in the economy, such as laundry folder, laundry sorter, and garment packer.  (*Id.* at 45.)

The ALJ asked the VE how much time off task and how many absences per month an employer would tolerate.  (*Id.*)  The VE testified as follows:

> Well, first off here, it will vary a bit and these are my opinions based on my experience.  The DOT documents do not address worksite behavior such as these.  I characterize tolerances for off task time a couple ways depending on the nature of the time off.  A small amount each time, a minute here, couple minutes there for example, I find the cumulative total threshold for this between 15 to 20 percent ballpark range.
>
> Now, that is above and beyond normally scheduled work breaks and lunch breaks.  But I'll add, if the person is off task for larger chunks of time each time, for example 10 minutes or -15 or 20 minutes each time off, this is much more problematic.  I find the tolerance for this to be much tighter, about five percent in those terms.  To do the math, that translates to roughly two extra breaks as we might normally think of a break.
>
> Absence tolerances will, again, also vary.  I find that a person who is absent three -- or I'm sorry, two days per month, three months in a row is likely going to lose that job at that point.  But I'll add, it could be less if it's [sic] goes on longer.
>
> To be more specific, if a person was unpredictably absent one day a month, month in, month out, he may not called [sic] to task until that annual evaluation.  But at that point, they're going to be put on notice.  And if that absence behavior continues, they're likely going to lose their job as well.

(*Id.* at 45-46.)

### III.  STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th

Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience.  *See* 20 C.F.R. § 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. § 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. § 416.920(g).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The most recent favorable medical decision finding that the claimant was disabled is the decision dated July 13, 2015.  This is known as the "comparison point decision" or CPD.

2.  At the time of the CPD, the claimant had the following severe impairments: bipolar disorder, anxiety disorder, fibromyalgia, and degenerative disc disease.  The claimant's bipolar disorder was found to meet section 12.04 of 20 CFR Part 404, Subpart P, Appendix I (20 CFR 416.920(d)).

3.  The medical evidence establishes that the claimant developed additional impairments after the CPD through March 1, 2017.  Thus, the claimant's current severe impairments are: bipolar disorder, anxiety disorder, fibromyalgia, degenerative disc disease, irritable bowel syndrome, and tumor of the pituitary gland.

4.  Since March 1, 2017, the claimant has not had an impairment or combination of impairments which meets or medically equals the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926).

5.  Medical improvement occurred on March 1, 2017 (20 CFR 416.994(b)(1)(i)).

6.  The medical improvement is related to the ability to work because, by March 1, 2017, the claimant no longer had an impairment or combination of impairments that met or medically equaled the same listing(s) that was met at the time of the CPD (20 CFR 416.994(b)(2)(iv)(A)).

7.  Since March 1, 2017, the claimant's impairments have continued to be severe (20 CFR 416.994(b)(5)(v)).

8.  After careful consideration of the entire record, I find that, beginning on March 1, 2017, the claimant has had the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) with the following additional limitations: The claimant can only occasionally climb ramps and stairs.  She can never climb ladders, ropes, or scaffolds.  She can only occasionally balance, stoop, kneel, crouch, and crawl.  The claimant can only occasionally work at unprotected heights.  She can only occasionally work with moving mechanical parts and occasionally operate a motor vehicle.  She must avoid concentrated exposure to dust, odors, fumes, and other pulmonary irritants.  The claimant is able to perform simple and routine tasks, but not at a production rate pace.  She is able to make simple work-related decisions.  She can have only superficial interaction with supervisors, coworkers, and the public.  She can only tolerate a few changes in a routine work setting.

9.  The claimant has no past relevant work (20 CFR 416.965).

10. On March 1, 2017, the claimant was a younger individual age 18-49 (20 CFR 416.963).

11. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

12. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

13. Since March 1, 2017, considering the claimant's age, education, work experience, and residual functional capacity, the claimant has been able to perform a significant number of jobs in the national economy (20 CFR 416.960(c) and 416.966).

14. The claimant's disability ended on March 1, 2017, and the claimant has not become disabled again since that date (20 CFR 416.994(b)(5)(vii)).

(Tr. 1388-94.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec*., 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec*., 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

Beck concedes her bipolar disorder no longer meets the Listings. (Doc. No 14 at 10.) However, Beck asserts, "since the time of her prior, favorable ALJ decision, [she] has struggled with multiple, worsening medical conditions, including chronic headaches, body-wide joint pains, neck pain and back pain, gastrointestinal dysfunction and abdominal pain, Vitamin D deficiency, and persistent bipolar and anxiety symptoms, as well as the more recently worked up pituitary tumor." (*Id.*) Beck argues that the combination of her current physical and mental impairments cause symptoms "that would result in her being off-task and or absent from work beyond the customary tolerances testified to by the [VE] at [the]

hearing." (*Id.* at 10-11.) Beck maintains, "The ALJ's analysis of [her] residual functional capacity lacked the support of substantial evidence and failed to account for the totality and the combination of symptoms and limitations arising from [her] many medical impairments." (*Id.* at 11.)

The Commissioner responds, "the ALJ thoroughly examined the record evidence and reasonably determined that there had been an improvement in Plaintiff's symptoms. As such, substantial evidence supports the ALJ's findings." (Doc. No. 17 at 7.)

The procedure for making a finding of medical improvement is set forth in 20 C.F.R. § 416.994. The first part of the evaluation concerns whether medical improvement has been demonstrated. *Kennedy v. Astrue*, 247 F. App'x 761, 764 (6th Cir. 2007). "A claimant's disability benefits may be terminated if there has been any medical improvement, if the improvement is related to the ability to work, and if the claimant is currently able to engage in substantial gainful activity." *Watts v. Comm'r of Soc. Sec.*, 179 F. App'x 290, 292 (6th Cir. 2006) (citing 20 C.F.R. § 404.1594(a)). "Medical improvement" is "any decrease in the medical severity of . . . impairment(s) [that] was present at the time of the most recent favorable medical decision that [the claimant was] disabled or continued to be disabled." *Id.* (quoting 20 C.F.R. § 404.1594(b)(1)). A finding of medical improvement "must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s)." *Kennedy*, 247 F. App'x at 765 (quoting 20 C.F.R. § 404.1594(b)(1)). The medical improvement must be related to the claimant's ability to work. The regulations state that a medical improvement is only related to a claimant's ability to work "if there has been a decrease in the severity . . . of the impairment(s) present at the time of the most recent favorable medical decision and an increase in your functional capacity to do basic work activities." *Id.* (quoting 20 C.F.R. § 404.1594(b)(3)). *See also Nierzwick v. Comm'r of Soc. Sec.*, 7 Fed. App'x 358 (6th Cir. 2001).

The second part of the evaluation concerns the claimant's ability to engage in substantial gainful activity. *Kennedy*, 247 F. App'x at 765. As the Sixth Circuit has explained, the implementing regulations for this part of the medical improvement analysis incorporate many of the standards set forth in regulations governing initial disability determinations, with one significant difference: the ultimate burden of proof lies with the Commissioner in termination proceedings. *Id.* (citing 20 C.F.R. § 404.1594(b)(5) and (f)(7); *Griego v. Sullivan*, 940 F.2d 942, 944 (5th Cir. 1991)).

Demonstrating a claimant still experiences "pain and medical problems that have been labeled 'severe'" will not preclude a finding of medical improvement. *Watts,* 179 F. App'x at 293-94.

The Court finds the ALJ properly discussed the evidence and made a clear connection between the RFC and his discussion. The ALJ's RFC analysis contains a thorough discussion of the record evidence. (Tr. 1389-93.) The ALJ acknowledged and weighed the medical opinions in the record (*id.* at 1392-93), and Beck does not challenge the ALJ's findings regarding those opinions or the weight assigned. (*See* Doc. No. 14 at 10-12.) The ALJ considered Beck's hearing testimony, including her testimony that she still had bouts of anger and avoided people because of her anxiety, and found Beck's statements were not entirely consistent with the objective medical and other evidence in the record. (Tr. 1391.) Beck does not challenge the ALJ's subjective symptom analysis on appeal. (*See* Doc. No. 14 at 10-12.) Furthermore, Beck has not shown she is more limited than the ALJ's RFC, which limited her to superficial interaction with coworkers, supervisors, and the public. (Tr. 1390.)

Beck argues it is not in dispute "that, throughout the time period at issue herein, [she] required medical appointments often enough to result in absences at least twice a month on average, as outlined above, not even accounting for days of headaches or other pains or bipolar episodes that would result in additional absences." (*Id.* at 12.) But as the Commissioner argues (Doc. No. 17 at 10), no medical opinions or other medical evidence support Beck's claim regarding absenteeism. (Doc. No. 14 at 12.)

Therefore, her argument is without merit.  *See Hodson v. Comm'r of Soc. Sec.*, Civil Action No. 3:17-cv-00096-GNS-CHL, 2018 WL 3326842, at *6 (W.D. Ky. Mar. 1, 2018) ("But, as the undersigned has noted, plaintiff did not present any medical record or medical source opinion regarding [absenteeism]."); *Pryor v. Comm'r of Soc. Sec.*, Case No. 14-13325, 2015 WL 12683977, at *7 (E.D. Mich. Aug. 21, 2015) ("However, Pryor has failed to set forth any facts or medical opinions which demonstrate that he requires physical therapy on a rigid schedule that would conflict with his ability to work.); *Bray v. Comm'r of Soc. Sec.*, No. 1:13-CV-00040, 2014 WL 4377771, at *3 (S.D. Ohio Sept. 13, 2014) ("In both [cases cited by plaintiff], there was specific affirmative evidence that indicated the plaintiff would have to be absent from work frequently during normal work hours and that those frequent absences likely would impair the plaintiff's ability to work . . . . [T]hat is not the case here."); *Swafford v. Comm'r of Soc. Sec.*, No. 1:12cv19, 2013 WL 1196590, at *1 (S.D. Ohio Mar. 25, 2013) ("However . . . evidence of frequent medical appointments alone is not enough.  Instead, there must be evidence such as a medical source opinion about the likelihood of absenteeism caused by the claimant's impairments and the need for treatment during working hours.") (citations omitted).[3]

---

[3] These cases involved the normal five-step sequential disability determination evaluation, not the seven-step medical improvement evaluation.  In the five-step sequential disability determination, the claimant has the burden of proof through Step Four and "always retains the burden of proving lack of RFC." *Hodson*, 2018 WL 3326842, at *3.  The Commissioner retains the ultimate burden in termination of benefits cases.  *Kennedy*, 247 F. App'x at 765 (citing 20 C.F.R. § 404.1594(b)(5) and (f)(7); *Griego v. Sullivan*, 940 F.2d 942, 944 (5th Cir. 1991)).  As the Sixth Circuit has explained, aside from the burden of proof, the implementing regulations for determining whether a claimant is able to engage in substantial gainful activity incorporate many of the standards set forth in regulations governing initial disability determinations.  *Id.* (citing 20 C.F.R. § 404.1594(b)(5) and (f)(7)).  While the Commissioner argues Beck retained the burden in demonstrating greater limitations than what the VE testified was acceptable and failed to meet her burden regarding absenteeism, Beck makes no argument that the Commissioner failed to meet his burden in this termination of benefits case.  Beck also did not file a reply brief in this case and therefore did not respond to the Commissioner's argument regarding the lack of medical evidence in support of absenteeism.

Beck does not identify any contrary lines of evidence the ALJ ignored or overlooked, nor does she accuse the ALJ of cherry-picking the record.[4] (*See id.*)  At bottom, Beck's RFC arguments are requests for the Court to reweigh the evidence, which it will not do.  The ALJ considered all of Beck's impairments and supported his conclusions with substantial evidence.  This places the ALJ's determination that Beck was no longer disabled after March 1, 2017, squarely within the "zone of choice."

Substantial evidence supports the ALJ's RFC analysis.  Accordingly, it is recommended the Court find the ALJ did not err in the RFC analysis.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date:  May 4, 2020

_s/ Jonathan Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

---

[4] One of the records Beck points to in support of her argument predates March 1, 2017, the date of medical improvement.  (Doc. No. 14 at 11) (citing Tr. 396-97).  Beck directs the Court to only one other treatment record, which predated the state agency reviewing physician's review on reconsideration.  (Doc. No. 14 at 11) (citing Tr. 475).